**COMMONWEALTH of Pennsylvania,**
**Appellee,**

v.

**Reginald THURSTON, Appellant.**

Superior Court of Pennsylvania.

Submitted June 2, 2003.
Filed Oct. 6, 2003.

Mitchell S. Strutin, Philadelphia, for appellant.

Catherine L. Marshall, Asst. Dist. Atty., Philadelphia, for Com., appellee.

BEFORE: MUSMANNO, BOWES and CAVANAUGH, JJ.

OPINION BY BOWES, J.:

¶ 1 Reginald Thurston appeals the judgment of sentence of sixteen to thirty-two months imprisonment followed by five years probation that was imposed following his conviction at a bench trial of theft and conspiracy. As we conclude that the Commonwealth violated the Interstate Agreement on Detainers, 42 Pa.C.S. § 9101 (the "IAD"), we are constrained to reverse the judgment of sentence and dismiss the charges.

¶ 2 The Honorable Patricia A. McInerney, who presided over Appellant's trial, reviewed the evidence produced at trial:

On August 16, 2000, at approximately 12:00 noon, Complainant Benjamin Trail ("Trail") was getting out of his van at the Acme parking lot near the 7100 Block of Germantown Avenue in Philadelphia, when he was approached by Defendant Thurston. (N.T. 5/17/02, p.p. 6, 7, 48, 53). Thurston, well-dressed in a navy blue suit and tie, employing a fake accent, approached Trail and explained that he was an African missionary and that he needed directions to the African Baptist Church. (N.T. 5/17/02, p.p. 8, 48, 53, 54). Thurston explained to Trail that he paid three-hundred dollars to a cab driver who had brought him there from the airport two hours earlier and left him with the assurance that he would get him a hotel. (N.T. 5/17/02, p.p. 48–49). While he spoke, Thurston "flashed" a large amount of money to Trail. (N.T. 5/17/02, p. 48).

During this exchange, a man named Jimmie, secretly working with Thurston, approached the other men and joined the conversation. (N.T. 5/17/02, p.p. 9, 49, 50, 51, 53, 54). All three men climbed into Jimmie's car. (N.T. 5/17/02 p.p. 9, 48, 60). Thurston "explained" to the other men that his brother had died in a plane crash. (N.T. 5/17/02, p. 49). Thurston had come to America to collect the $150,000 proceeds from his brother's insurance policy. *Id.* He told them that he had just come from the lawyer's office with $80,000 cash and that he was unable to take it back to his country. (N.T. 5/17/02, p. 49) Thurston showed the men a bogus letter from an attorney attesting to his receipt of the $150,000, along with two "knots" of cash comprised of three hundred ones with a $100 bill on each side. (N.T. 5/17/02, p. 53–54). Thurston explained that he wanted to give the money to someone who could donate it to needy people. (N.T. 5/17/02, p. 49).

When Trail and Jimmie offered to donate the money, Thurston requested that they show good faith by putting up their own money first. *Id.* Jimmie then pretended to go to his bank and withdrew five or ten thousand dollars. (N.T. 5/17/02, p. 49–50). In return, Thurston gave him what was supposed to be $40,000 of the insurance proceeds. (N.T. 5/17/02, p. 50–54). The three men then drove to Beneficial Bank at Broad and Olney where Trail withdrew $1,200 from his Discovery credit card and gave the money to Thurston. (N.T. 5/17/02, p.p. 13, 15, 16, 56).

The men then went to an American Appliance store to buy some "gifts" for Thurston to take back to his country. (N.T. 5/17/02, p.p. 16, 17, 50). Trail paid for the merchandise with his credit card with the understanding that he would be

reimbursed from the $40,000 which Thurston would give him. (N.T. 5/17/02, p.p. 50, 59, 60).

In an attempt to get Trail to put up more money, Thurston told him that he had actually collected the entire $150,000 from the lawyer and that he had more money in his sock. (N.T. 5/17/02, p. 57) If Trail could come up with additional funds, Thurston would give him more money. *Id.* Trail agreed and Jimmie drove the men back to Beneficial Bank where Trail withdrew an additional $1,300, which he gave to Thurston. (N.T. 5/17/02, p.p. 20, 21, 55).

Thurston then gave Trail a handkerchief which supposedly contained the $2,500 which Trail had withdrawn from the bank, as well as a bag of cut up newspapers which Trail believed was $40,000. (N.T. 5/17/02, p.p. 50–52). To end the entire charade, Thurston told Trail he was returning to the airport. (N.T. 5/17/02, p.p. 52, 65, 66). When Trail offered to drive, Thurston and Jimmie told Trail that he should go home and put his money away safely. (N.T. 5/17/02, p.p. 51, 52, 65, 66). Trail left to retrieve his truck. (N.T. 5/17/02, p.p. 51, 52).

Upon realizing that the sack did not contain money, Trail attempted to follow Thurston and Jimmie. (N.T. 5/17/02, p.p. 22, 44). Unsuccessful in his attempt to catch them, fifteen minutes later Trail called 911 and despite the fact that this was a classic "flim-flam," informed the police that he was kidnapped and robbed. (N.T. 5/17/02, p.p. 22, 23, 44, 45, 67).

On October 9, 2000, a warrant was issued for Thurston's arrest. (N.T. 3/27/02, p. 2). In March 2001, the Philadelphia Police Department became aware of Thurston's location by notice

from the federal institution where Thurston was housed. *Id.*

Trial Court Opinion, 10/22/02, at 2–4 (citations to record omitted).

¶ 3 The following additional facts are pertinent. On October 9, 2000, an arrest warrant was issued for the crimes at issue in this case. In March 2001, police discovered that Appellant was incarcerated in a federal prison in Maryland. On April 19, 2001, Appellant filed a request for final disposition of the charges outstanding in Pennsylvania pursuant to Article III of the IAD, which provides:

(a) Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within 180 days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint: **Provided, That for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance.**

42 Pa.C.S. § 9101 Article III(a) (emphasis added).

¶ 4 Appellant simultaneously, on April 19, 2001, filed a request for final disposition under the IAD with Virginia pursuant to its Agreement on Detainers regarding the charges pending against Appellant in

that jurisdiction. Appellant's April 19, 2001 request regarding these Pennsylvania charges was forwarded to the warden of the federal prison on June 1, 2001, and received on June 8, 2001, by the District Attorney of Philadelphia County. The request was processed and sent to the extradition unit on June 19, 2001, which contacted the Philadelphia Police Department. On July 10, 2001, when police approved the cost of Appellant's return to Pennsylvania to face these charges, the extradition unit sent the proper documentation to federal prison to obtain custody of Appellant.

¶ 5 The extradition unit was informed that Virginia had taken custody of Appellant on July 9, 2001. Appellant was returned to federal prison from Virginia on October 16, 2001, he was brought to Philadelphia, and his trial was scheduled to begin on March 27, 2002. On March 20, 2002, Appellant moved to dismiss the charges based on a violation of the IAD. Argument was held on the motion on March 27, 2002, and on April 22, 2002, when it was denied. Since Appellant's counsel was not available for trial until May 17, 2002, N.T. Pretrial Motion, 4/22/02, at 59–60, trial commenced that day. Appellant was convicted and sentenced and then filed the present appeal, reiterating his claim of entitlement to discharge under the IAD.

■ ¶ 6 We examine the applicable law. The IAD provides that a defendant shall be tried within 180 days after he shall have caused to be delivered to the prosecuting officer written notice of the place of his imprisonment and his request for a final disposition. The Philadelphia District Attorney's Office received the notice of Appellant's request for final disposition on June 8, 2001. The 180 days commenced on that date. *Fex v. Michigan*, 507 U.S. 43, 113 S.Ct. 1085, 122 L.Ed.2d 406 (1993) (180-day period under IAD commences

once jurisdiction receives notice of request for final disposition). Thus, under the general provisions of the IAD, the Commonwealth had until December 5, 2001, to try Appellant.

■ ¶ 7 Next, we examine the portion of the IAD that calls for excluding time from the 180-day calculation. Article VI(a) of the IAD states, "(a) In determining the duration and expiration dates of the time periods provided in Articles III and IV of this agreement, the running of said time periods shall be tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction of the matter." 42 Pa.C.S. § 9101 Article VI(a). Appellant was unavailable to stand trial due to his presence in Virginia from July 9, 2001, to October 16, 2001. Thus, those ninety-nine days are excludable. That exclusion extends the IAD run-date to March 14, 2002. Appellant filed his petition to dismiss on March 20, 2002, after the time had expired.

¶ 8 The Commonwealth maintains that Pennsylvania had a full 180 days to try Appellant **after** he was returned to federal prison from Virginia on October 16, 2001. It suggests that the excludable time under section 9101(VI)(a) should not be simply the period that Appellant was located in Virginia. Instead, the Commonwealth maintains that it is entitled to another full 180 days commencing October 16, 2001, after Appellant's return from Virginia.

¶ 9 The clear and unambiguous statutory language does not support this position. Appellant caused to be delivered the appropriate documentation to Pennsylvania on June 8, 2001, thus invoking the IAD's provisions. There is no case law nor is there statutory authority to support the Commonwealth's contention that a new date is triggered by some event other than the request for final disposition. We simply cannot agree with the Commonwealth's

position that some latent ambiguity exists in the IAD language which would permit us to adopt its interpretation.

■ ¶ 10 The IAD is remedial in nature, and it is to be liberally construed in favor of the prisoner so as to effectuate its purpose. *Commonwealth v. Mayle*, 780 A.2d 677 (Pa.Super.2001). The statute states that a defendant shall be tried within 180 days after he causes to be delivered to the prosecuting officer his request for a final disposition.

¶ 11 Clearly, the time Appellant was in custody in Virginia is excluded from the 180 days because he was not able to stand trial in Pennsylvania while he was on trial in Virginia. Thus, July 9, 2001, to October 16, 2001, should be excluded from the calculation. However, March 27, 2002,[1] Appellant's scheduled trial date, was 192 days after the June 8, 2001 triggering of the 180–day time frame, not including the excluded time period. Appellant filed his request for dismissal under the IAD on March 20, 2002, six days after the run-date.

■ ¶ 12 Indeed, we find *Mayle* controlling. In *Mayle*, the Commonwealth, for valid reasons, was not able to try the defendant within the 180 days permitted by Article III. We held that the Commonwealth is required to request a continuance once it becomes clear that a defendant cannot be tried within the time constraints required under the IAD and that when the Commonwealth fails to file a continuance, dismissal of the charges is mandated. We observed that subsection (a) of Article III expressly permits the Commonwealth to obtain a continuance for good cause. We further concluded that a harmless error analysis will not be applied when the Commonwealth fails to comply with the strict language of the statute. *See Alabama v. Bozeman*, 533 U.S. 146, 121 S.Ct. 2079, 150 L.Ed.2d 188 (2001). Thus, it is irrelevant that a continuance could or would have been granted. It is imperative that a continuance be obtained in order to extend the run-date for cause.

¶ 13 The Commonwealth maintains that the IAD contains no mechanism when two jurisdictions are triggered on the same day and that the statute can be construed as allowing a new start date under its provisions. We disagree. The statute expressly allows for excludable time when the defendant is unavailable. Clearly, Appellant was unavailable when he was located in Virginia. However, we cannot find any support in the language of the IAD for the Commonwealth's position that it was entitled to a new 180–day period once Appellant was returned from Virginia.

¶ 14 The trial court, which obviously struggled with the issue, concluded that each state must receive its own 180–day period; otherwise, the prosecution of a defendant who is wanted in more than

---

1. In footnote nine on page eighteen of its brief, the Commonwealth suggests that Appellant was present at a status conference on February 5, 2002, and agreed to a trial date beyond the IAD run-date, thus waiving application of the IAD. *See New York v. Hill*, 528 U.S. 110, 120 S.Ct. 659, 145 L.Ed.2d 560 (2000). However, the Commonwealth does not reference the record for this factual assertion, and the record does not contain a transcript dated February 5, 2002. Our review of the March 27, 2002, and April 22, 2002 transcripts, which contain the arguments on the IAD issue, failed to uncover any argument that Appellant's IAD claim was waived in this manner. In fact, the trial court indicates that there is no waiver of the IAD claim, stating that if we are not persuaded that each receiving state receives its own 180 days, it is clear that Appellant's IAD claim is meritorious. Trial Court Opinion, 10/22/02, at 9 n. 2. As the record does not contain any support for a finding that Appellant waived the IAD by expressly agreeing to trial beyond the IAD run-date, we cannot accept the Commonwealth's assertion.

one state would be hampered unfairly. However, we cannot agree since the Commonwealth easily could have obtained a continuance under the express statutory language. Its failure to do so is fatal. *Id.; see also Commonwealth v. Thornhill,* 411 Pa.Super. 382, 601 A.2d 842 (1992).

¶ 15 While the fact that the Commonwealth had to re-initiate its attempt to gain custody over Appellant following his return from Virginia may have been grounds for a continuance, the Commonwealth's failure to obtain such a continuance compels our decision.

¶ 16 Judgment of sentence reversed. Charges dismissed. Jurisdiction relinquished.