64 Cal.Rptr.3d 572 (2007)
154 Cal.App.4th 228
Phillip NETZLEY, Petitioner,
v.
The SUPERIOR COURT of San Bernardino County, Respondent;
The People, Real Party in Interest.
No. E040033.
Court of Appeal of California, Fourth District, Division Two.
August 17, 2007.
*573 Doreen Boxer, Public Defender, Gerald Farber, Interim Public Defender, and George Wright, Deputy Public Defender, for Petitioner.
No appearance by Respondent.
Michael A. Ramos, District Attorney, and Brent J. Schultze, Deputy District Attorney, for Real Party in Interest.

OPINION
McKINSTER, J.
Petitioner, Phillip Netzley, moved to dismiss criminal charges pending against him because of an alleged violation of the Interstate Agreement on Detainers (IAD). (Pen.Code,[1] § 1389.) The trial court denied the motion to dismiss, and petitioner filed for a writ of mandate.
The issue presented in this case is whether petitioner was "unable to stand trial," within the meaning of the IAD, while he was serving a term of disciplinary segregation as the result of his repeated bad and violent acts in prison. We agree with the lower court's determination that the period of delay during which petitioner was in Oregon's Intensive Management Unit (IMU) rendered him "unable to stand trial" and, in turn, tolled the running of the 180-day statutory period from January 30 to July 28, 2005 (a total of 179 days). When petitioner moved to dismiss on November 4, 2005, the 180-day period had not yet expired, and he could still have been brought to a timely trial under the provisions of the IAD.

FACTS AND PROCEDURAL BACKGROUND
On or about December 20, 2003, petitioner allegedly committed several criminal acts in San Bernardino, California. Testimony taken during preliminary hearings established that petitioner created a disturbance at the Wooden Nickel Bar, left after a physical altercation with the bar's, owner and returned sometime later with a handgun. Upon his return, petitioner purportedly opened fire on bar staff, firing two shots at bartenders. One went into the wall and one into the chest of the bar *574 owner. A warrant was issued for petitioner's arrest on January 14, 2004.
On October 19, 2004, petitioner was admitted to the Two Rivers Correctional Institution in Umatilla, Oregon (Two Rivers), after convictions on third degree assault and first degree intimidation charges. The following day, petitioner began a pattern of disorderly, disobedient, and violent conduct in prison. Petitioner was placed in administrative segregation for second degree assault and other disciplinary infractions from October 20, 2004, through December 28, 2004.
Pursuant to petitioner's desire for immediate disposition of the charges pending in California, on January 28, 2005, a proper IAD request was sent from the Two Rivers facility to the District Attorney of San Bernardino County. The forms were received by the San Bernardino District Attorney on February 3, 2005.
On January 30, 2005, two days after submitting his IAD request to the warden of Two Rivers, petitioner committed first degree assault and various other infractions that led to a $200 fine and a term in disciplinary segregation from January 30, 2005, until July 28, 2005. Petitioner was transferred from Two Rivers and placed in the IMU at Snake River Correctional Institution (Snake River). According to the administrative rules of the Oregon Department of Corrections, a prisoner is transferred to IMU when he, "... demonstrates the need for maximum custody housing by demonstrating behaviors that cannot be controlled in other housing as indicated by high severity and/or chronic misconduct sanctions, escape activity or security threat group activities causing serious management concerns." (Or. Admin. R. XXX-XXX-XXXX (2007).) Petitioner's bad behavior in prison did not end while he was housed at Snake River. He committed first degree assault in April and June 2005, while in disciplinary segregation, and was cited for disorderly and disobedient behavior on numerous occasions.
On March 14, 2005, the San Bernardino County District Attorney's office informed the Oregon Department of Corrections that all of the necessary IAD documents had been executed and that San Bernardino County wanted to receive the prisoner as soon as possible, "pending ... subject's availability for transport." An e-mail response from the Oregon Department of Corrections indicated that the request for transport to San Bernardino County was "DENIED" because "[u]nder the terms of the sanction [disciplinary segregation], [petitioner] will not be free to travel until after 7/28/2005." Several interoffice e-mails among personnel at the Oregon Department of Corrections followed. In one such e-mail, an employee told another that the "DOC could release [petitioner] but they really do not like too [sic] because the Disciplinary Segregation time runs while [petitioner] is out on the IAD." Another Oregon Department of Corrections employee responded that she was going to send the San Bernardino County District Attorney's office formal notice of petitioner's unavailability so that San Bernardino County would have protection against any writ that petitioner might later file.
On March 16, 2005, an official letter was sent from Two Rivers in Oregon to the San Bernardino District Attorney. The letter stated that petitioner had been "denied transfer of custody until after the date of July 28, 2005 because [petitioner] is currently housed in a disciplinary segregation unit for assault. The Interstate [A]greement on [Detainers offers protection to receiving states if the sending state does not make the inmate available; the period is tolled during any time that the defendant is `unable to stand trial.'" (Emphasis in original.) The notion that petitioner *575 "could" be released, but the Oregon Department of Corrections "really [does] not like too [sic ]" was never expressed to the San Bernardino District Attorney. All official correspondence indicated that transport prior to July 28, 2005, was not an option due to the disciplinary action caused by petitioner's conduct. Furthermore, a message received by an employee at the San Bernardino District Attorney's office indicated that Oregon officials also felt petitioner was "too dangerous for transport."
Petitioner was transferred to San Bernardino County on August 14, 2005, to face charges for possession of a firearm by a felon, discharge of a firearm with gross negligence, and assault with a firearm. Transport occurred 17 days after the end of petitioner's term in disciplinary segregation in Oregon. On November 4, 2005, petitioner's counsel filed a motion to dismiss the charges pending in San Bernardino County. The motion alleged that the 180-day time limit to commence trial under the IAD had expired. The motion was denied on December 12, 2005, but petitioner waived time from that date until February 27, 2006, to prepare a petition for a writ of mandate. On March 7, 2006, petitioner waived additional time to finish preparing his writ petition. The petition was filed with this court on March 10, 2006.

DISCUSSION
The IAD is a compact among the states that establishes "procedures for the transfer of prisoners incarcerated in one jurisdiction to custody of another jurisdiction where criminal charges are pending." (35 C.J.S. (2007) Extradition and Detainers, § 68.) The IAD enables a state to gain temporary custody of a prisoner in order to try him or her on criminal charges. (35 C.J.S., supra, Extradition and Detainers, § 68.) Under article III of the IAD, a defendant "shall be brought to trial within one hundred eighty days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment ...."(§ 1389, art. Ill, subd. (a).) If the defendant is not brought to trial within the 180-day statutory period, pending charges are dismissed with prejudice. (§ 1389, art. V, subd. (c).)
In determining the duration and expiration dates of the time period, there are two statutory exceptions when the period may exceed 180 days. Under article VI, subdivision (a) of the IAD, "the running of said time periods shall be tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction of the matter." (Emphasis added.) Article III, subdivision (a) identifies "good cause shown in open court" as an additional reason for the trial court to extend the time limit. This extension is designed to cover situations where the 180-day period is going to expire imminently, and the time period should be extended for good cause. (People v. Posten (1980) 108 Cal.App.3d 633, 643, 166 Cal.Rptr. 661 (Posten) [stating that the unavailability of witnesses is a good cause].) The "good cause" provision is not implicated in this case. Therefore, we concern ourselves only with the applicability of the tolling provision.

1. Administrative or Legal Unavailability Can Render a Defendant "Unable to Stand Trial"

There are three different interpretations of the term "unable to stand trial." (US. v. Collins (9th Cir.1996) 90 F.3d 1420, 1426 (Collins).)
The Fifth Circuit has adopted the narrowest interpretation. It interprets the *576 term to mean a prisoner is unable to stand trial only when a prisoner is physically or mentally incapacitated and therefore unable to stand trial. (Collins, supra, 90 F.3d at pp. 1426-1427.)
A second interpretation adopted by the Second and Fourth Circuits simply applies the same tolling provisions contained in the Speedy Trial Act (18 U.S.C. § 3161(h)(1)-(9)). (Collins, supra, 90 F.3d at p. 1427.)
A third interpretation, followed by the Seventh and Eighth Circuits among other jurisdictions, is the broadest and determines a prisoner to be unable to stand trial whenever the prisoner is "legally or administratively" unavailable. (Collins, supra, 90 F.3d at p. 1427.)
The court in Collins rejected an interpretation based only on a prisoner's physical or mental capacity as too narrow stating that under the express terms of the IAD, it does not apply to mentally ill persons. "Had the drafters of the [IAD] wanted to exclude only the physically incapacitated, in addition to the mentally ill, they would have done so explicitly." (Collins, supra, 90 F.3d at p. 1427.) We reject it also. As a Florida court observed in interpreting the IAD, "`it doesn't matter whether [a prisoner] was physically incapacitated or not....' ... It is generally accepted that a defendant may be unable to stand trial for reasons other than physical or mental disability." (Fuente v. State (Fla.1989) 549 So.2d 652, 655-656.)
The court in Collins adopted the interpretation that applies the same tolling provisions of the Speedy Trial Act. (Collins, supra, 90 F.3d at p. 1427.) We respectfully disagree because such an approach is not consistent with the intent of the IAD since it undermines the discretion of "the court having jurisdiction of the matter" (§ 1389, art. VI, subd. (a)) to determine whether a prisoner is unavailable to stand trial based on the unique facts of each case, and Article IX of the IAD specifies that "[t]his agreement shall be liberally construed so as to effectuate its purposes." For these reasons, we adopt the interpretation that a prisoner is unavailable to stand trial whenever the prisoner is legally or administratively unavailable as determined by the court having jurisdiction of the case.
The Collins court rejected the interpretation that a prisoner is unavailable to stand trial whenever the prisoner is legally or administratively unavailable. It did so virtually out of hand and with minimal analysis only stating, "[T]his test is too broad. It provides little guidance to the district courts and its meaning could only be developed slowly on a case-by-case basis." (Collins, supra, 90 F.3d at p. 1427.) Again, we respectfully disagree.
The Collins court, in part, adopted an interpretation embracing the tolling provisions of the Speedy Trial Act because there is already extant a considerable body of case law interpreting its tolling provisions which would give guidance to the district courts. (Collins, supra, 90 F.3d at p. 1427.) We understand the Collins court's desire to provide district courts with an instant ready-made body of law to guide their interpretation of the IAD. However, we see nothing wrong with a case-by-case development of the law based on the unique facts of each case. Indeed, that is the way law is established in the common law tradition.
Our approach to interpretation of the term "unable to stand trial" does not vest unfettered discretion in the court having jurisdiction of the matter because we imply a reasonableness standard, as we will more fully explain below, when a court determines the issue of a prisoner's unavailability to stand trial.

*577 2. Legal or Administrative Unavailability Includes Periods of Delay Caused by the Defendant

It is well established among state and federal courts that the statutory language "unable to stand trial" includes "all those periods of delay Occasioned by the defendant." (Posten, supra, 108 Cal.App.3d at p. 643, 166 Cal.Rptr. 661 [concluding that a defendant's refusal to travel by air tolled the 180-day period while alternative transport was arranged]; United States v. Boggs (5th Cir.1980) 612 F.2d 991, 993 (Boggs) [holding that a defendant who delayed his own trial by reneging on an agreement to plead guilty could not benefit from the delay]; U.S. v. Dawn (7th Cir. 1990) 900 F.2d 1132, 1136 (Dawn) [finding that a defendant's motion to dismiss tolled the 180-day period]; United States v. Scheer (2d Cir.1984) 729 F.2d 164, 168-169 [finding that a defendant's motions for new counsel, copies of court transcripts, and to suppress evidence all tolled the statutory period].) It is also generally accepted that these tolling periods need not be limited to instances when a defendant is literally unable to stand trial due to a physical or mental disability. (Collins, supra, 90 F.3d at p. 1426; Fuente, supra, 549 So.2d at pp. 655-656.) While many of these cases included delays occasioned by various motions, there is no reason to limit a tolling to procedural delays. (Dawn, supra, 900 F.2d at p. 1136.) Rather, "[t]he inability [to stand trial] may be imposed by other kinds of restraint...." (State ex ret. Taylor v. McFarland (Mo.App.1984) 675 S.W.2d 868, 873 (McFarland).) For example, in McFarland a discretionary legal and administrative restriction imposed upon the defendant served to toll the IAD countdown. (McFarland, at p. 873.) The defendant was "unable to stand trial" because a California prison followed a judge's order requiring the defendant to remain in the state to serve as a witness. (Ibid.)
Similar to the "legal and administrative restriction" imposed by the prison officials in McFarland, supra, 675 S.W.2d 868, the Oregon Department of Corrections legitimately kept petitioner in Oregon pursuant to the prison's administrative decision that he serve six to seven months in IMU. The fact that the prison in McFarland was compelled by a judge's order rather than a prison's administrative decision does not make it any less valid. Both are institutions having authority over the defendant which kept the defendant in the sending state for valid policy reasons. In McFarland the policy reason was judicial administration. The defendant was a witness in a pending trial. In petitioner's case, the policy reasons are two-fold. First, the time in IMU was disciplinary to correct his bad conduct in prison. Second, the Oregon Department of Corrections sought to separate petitioner from the general prison population in order to protect inmates from his violent behavior. Certainly, the first policy would be defeated if his administrative segregation time expired while he was out to court in California.
The IAD countdown was tolled automatically from February 3, 2005, the date the San Bernardino District Attorney received the forms,[2] until July 28, 2005, when the disciplinary segregation time expired, because petitioner was "unable to stand trial, as determined by the court having jurisdiction of the matter." (§ 1389, art. VI, subd. (a).)

3. The Actions of the Sending Jurisdiction (Oregon) Were Reasonable

The IAD is intended to "encourage the expeditious and orderly disposition" of *578 any outstanding criminal charges. (§ 1389, art. I.) The delay by Oregon prison officials in sending petitioner to authorities in San Bernardino was reasonable and does not offend the purposes of the IAD. We agree with petitioner that the IAD seeks to protect prisoners against retaliatory, unlawful actions by prison officials. For this reason, we examine Oregon's delay in light of the "reasonableness standard" adopted in People v. Wilson (1977) 69 Cal. App.3d 631, 635-636, 138 Cal.Rptr. 259 (Wilson). Concededly, this requires widening the scope of the test beyond the period of delay between request and receipt of a prisoner's IAD forms, as applied by the court in Wilson, to include the period between receipt of the forms and commencement of the prisoner's trial. An expansive application of the reasonableness test is consistent with the notion that in order to preserve a prisoner's right to a trial, delays occasioned by a warden's negligence, willful misconduct, or unreasonable delays should not serve to toll the 180-day time limit. (Fex, supra, 507 U.S. at pp. 50-52, 113 S.Ct. 1085 [establishing that a warden's delay in forwarding a prisoner's IAD request should not adversely affect the prisoner's right to a speedy trial]; People v. Lincoln (1979) 42 Colo.App. 512, 516, 601 P.2d 641 [finding that the adverse consequences of official oversights should not be visited on the prisoner].) Without an implied requirement that the sending state's duty will be performed reasonably, an inmate's rights to an expeditious trial may never mature. (Wilson, supra, 69 Cal.App.3d at p. 638, 138 Cal. Rptr. 259.)
Petitioner's transfer to the correctional institution at Snake River occurred after Oregon officials had received and sent notice of his IAD request. The record does not demonstrate that this disciplinary action was retaliatory or a pretext for Oregon's alleged noncompliance with the act.
Under Oregon law, assault in the first degree is a Class A felony whereby a person "[i]ntentionally causes serious physical injury to another by means of a deadly or dangerous weapon." (Or.Rev. Stat. § 163.185.) Disciplinary segregation in IMU is a reasonable corrective action for such a severe offense, especially in light of the fact that petitioner received similar punishment for a lesser offense in October 2004, before petitioner made his request pursuant to the IAD. Furthermore, while he was housed in IMU, petitioner committed three additional violations, including another act of first degree assault. Rather than leveraging these violations to increase petitioner's time in IMU, Oregon prison officials opted to impose alternate sanctions, such as loss of the segregation yard and fines, which did not increase the time he was "unable to stand trial." If anything, petitioner possibly received lighter punishment than he would have because the Oregon Department of Corrections had already promised transport after July 28, 2005. The nature of petitioner's prison offenses and the manner in which corrective discipline was imposed belies his contention that he was transferred and held in IMU in order simply to allow Oregon officials to flout their statutory duty under the IAD by unreasonably delaying his prosecution for the charges pending in California. The Oregon officials acted reasonably and legitimately imposed administrative corrective discipline in apparent good faith.
This is not an instance of simple inaction on the part of Oregon prison officials. Their denial of transport was limited to the time period petitioner was housed in IMU for assault. Shortly after petitioner's release from the facility, Oregon kept its promise and transported him to San Bernardino authorities. From Oregon's perspective, it had a legitimate interest in not *579 sending petitioner to answer the charges against him in California before the termination of his disciplinary segregation on July 28, 2005. If Oregon officials had transferred custody of petitioner to San Bernardino County before this date, the remaining time he owed in administrative segregation would have been lost since it would have continued to run and ultimately expire while he was away.
The warden of a state prison "is not an arm of the court" (U.S. v. Nesbitt (7th Cir.1988) 852 F.2d 1502, 1516, fn. 15) and, therefore, should not be found to have acted unlawfully simply because he chose to exercise his discretion. Undercutting the discretionary power of the sending state's prison officials to administer programs designed to control, discipline, and aid those whose welfare and supervision they are charged with does not foster the implementation of "cooperative procedures" between states. (§ 1389, art. I.) We agree that petitioner should not suffer prejudice by virtue of an unreasonable delay. (Posten, supra, 108 Cal.App.3d at p. 644, 166 Cal.Rptr. 661.) However, this is not to say that he should benefit from a situation caused by his own misconduct in prison. Oregon officials should not be compelled under the authority of the IAD to release petitioner from disciplinary segregation prematurely. That would place him in a better position than he would have been in had he not filed his IAD request. Such a result is not only inconsistent with the purpose of the IAD, it would allow petitioner to take advantage of his own wrongdoing. A prisoner who creates a situation in which the IAD is violated cannot then benefit from it. (Boggs, supra, 612 F.2d at p. 993.)

4. The Actions of the. Receiving Jurisdiction (San Bernardino County) Were Reasonable

Petitioner claims that San Bernardino County should have commenced legal action against Oregon officials to secure custody and, because it did not, it should suffer the adverse consequences of Oregon's purported failure to comply. In Wilson, the Court of Appeal agreed that such a burden could be appropriately placed on a receiving state. "While the district attorney's office cannot insure the compliance of the correctional officers of other states, they are better situated than the inmate to see that the requirements of the law are met." (Wilson, supra, 69 Cal. App.3d at p. 637, 138 Cal.Rptr. 259.)
The court in Wilson did not specify to what lengths the district attorney must go in order to secure compliance, but we are satisfied that San Bernardino met its obligation. Despite petitioner's allegations that the San Bernardino County District Attorney was noncompliant with the IAD, this court finds that the district attorney acted reasonably with regard to requesting petitioner's transport to California. On March 14, 2005, the district attorney requested that petitioner be transported as soon as possible. This request was specifically denied by the Oregon Department of Corrections with assurances that the IAD countdown would be tolled because the prisoner was not free for transport and, therefore, "unable to stand trial." It was expressly stated that the Oregon Department of Corrections made an administrative decision that prevented the prisoner's transport until July 28, 2005. Petitioner's repeated acts of violence forced the Two Rivers facility to discipline him. San Bernardino County was not aware of the email claiming "DOC could release him but they really do not like too [sic]" since it was sent internally between Oregon personnel. The San Bernardino County District Attorney had neither reason to doubt Oregon's assurances nor the authority to question its administrative decisions.
*580 There was no failure of compliance on behalf of either party. Contrary to petitioner's claim, this should not be treated as an instance in which "[t]he dismissal provision of the Agreement mandates that the adverse consequences of the authorities failure to comply with the act shall be visited on the prosecution." (Wilson, supra, 69 Cal.App.3d at p. 637, 138 Cal.Rptr. 259, fn. omitted.)
Arguably, legal action might have been necessary for an unreasonable time delay or a delay for an improper reason if it had become clear to the San Bernardino District Attorney that intervention was necessary in order to avoid a violation of the IAD. However, this was not the case, and we need not address that issue. Oregon officials promised California custody of petitioner after July 28, 2005. He was delivered to San Bernardino County on August 15, 2005. A delay of only two weeks appears reasonable.
We emphasize the policy rationale of disallowing an administrative delay caused by a prisoner's own bad acts from counting toward the IAD's 180-day time period. (§ 1389, art. Ill, subd. (a).) To hold otherwise would allow prisoners who have properly filed a section 1389 request for immediate disposition to engage in disruptive and violent behavior with impunity. An inmate could assault guards and fellow prisoners, disobey guards, or worse, with confidence he would not face administrative segregation to correct his behavior. Allowing prisoners to avoid disciplinary action or, worse yet, instilling incentives to commit serious violations, is not a policy this court wishes to promote.
We acknowledge that a fine balance must be struck between a prison's administrative discretionary decisions and a prisoner's right to be protected against violations of the IAD that may result from an abuse of that discretion. To that end, this court adopts a standard that requires the trial court to consider the reasonableness of a delay in light of the actions of both the prison and the prisoner.
Petitioner engaged in behavior he knew or should have known would result in corrective action, thus causing his trial delay in San Bernardino County. Petitioner was "unable to stand trial" due to his own conduct, "as determined by the court having jurisdiction of the matter." (§ 1389, art. VI, subd. (a).) Neither Oregon's nor California's actions were unreasonable, and they should not be penalized for the delay petitioner caused. The 180-day time period was tolled from February 3, 2005, the date the 180-day period would have begun, until July 28, 2005, the day his term in disciplinary segregation ended.

DISPOSITION
The petition for writ of mandate is denied.
We concur: RAMIREZ, P.J., and HOLLENHORST, J.
NOTES
[1] All subsequent statutory references are to the Penal Code.
[2] See Fex v. Michigan (1993) 507 U.S. 43, 51, 113 S.Ct. 1085, 122 L.Ed.2d 406 (Fee) ("Indications in the text of Article III [of § 1389] confirm, in our view, that the receiving State's receipt of the [IAD] request starts the clock").