COURT OF APPEALS


EIGHTH DISTRICT OF TEXAS


EL PASO, TEXAS



)
 

TED CALVIN BLAND,
)
 No. 08-02-00437-CR

)


 Appellant,
)
 Appeal from

)
 

v.
)
 109th District Court

)


THE STATE OF TEXAS,
)
 of Winkler County, Texas

)


 Appellee.
)
 (TC# 4171)


O P I N I O N



 Ted Calvin Bland appeals his conviction for aggravated assault against a public servant. A
jury found Appellant guilty and assessed punishment at thirty years' imprisonment and a $5,000 fine. 
We affirm.

PROCEDURAL HISTORY
 

 Appellant was indicted for aggravated assault of a public servant on July 17, 1997. On
March 5, 1998, he filed a pro se motion to dismiss for denial of a speedy trial. He alleged that he
was arrested on May 9, 1997 for aggravated assault, that he was arrested on a federal indictment on
May 21, 1997, and that he was currently in federal custody. He later filed an addendum which
included four letters from Donna Nunnelly, inmate systems manager for the Federal Bureau of
Prisons. The letters were sent to the district attorney and the district clerk and concerned Appellant's
application for final disposition of the charges pending before him pursuant to the Interstate
Agreement on Detainers Act (IADA). Dated January 5, 1998, the first letter instructed the district
attorney and the district clerk as to the procedures for gaining temporary custody of Appellant. The
State tried to contact Nunnelly but the telephone number given was incorrect. On October 15, 1998,
Appellant filed a pro se motion to dismiss indictments for failure to comply with the IADA. He
argued that the 180-day time limit under IADA had elapsed, as had the 120-day time limit under the
speedy trial requirements. The trial court denied the motion to dismiss. The case was was set for
trial on June 18, 2002, and Appellant requested a continuance. The trial was actually conducted in
September 2002.

RIGHT TO SPEEDY TRIAL/INTERSTATE AGREEMENT ON DETAINERS ACT


 In Point of Error No. Three, Appellant argues that he was denied his Sixth Amendment right
to a speedy trial and that his request to be brought back under the Interstate Agreement on Detainers
Act (IADA) was consistently ignored.

Right to Speedy Trial


 The Sixth Amendment to the Constitution of the United States provides that, "[i]n all
criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." U.S. Const. amend.
VI. This right is applicable to state criminal prosecutions by virtue of the Due Process Clause of the
Fourteenth Amendment. Klopfer v. North Carolina, 386 U.S. 213, 223, 87 S.Ct. 988, 18 L.Ed.2d
1 (1967). If a violation of the speedy trial right is established, the only possible remedy is dismissal
of the prosecution. Strunk v. United States, 412 U.S. 434, 440, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973).

 In determining whether an accused has been denied his right to a speedy trial, a court must
apply a balancing test in which the conduct of both the prosecution and the defendant are weighed.
Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The factors to be
considered include, but are not necessarily limited to, the length of the delay, the reason for the delay,
the defendant's assertion of his speedy trial right, and the prejudice to the defendant resulting from
the delay. Id. No single factor is necessary or sufficient to establish a violation of the right to a
speedy trial. Id. at 533.

Length of Delay


 Length of delay is measured from the time the defendant is arrested or formally accused. 
United States v. Marion, 404 U.S. 307, 313, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). The length of the
delay is, to some extent, a triggering mechanism, so that a speedy trial claim will not even be
considered until passage of a period of time that is, on its face, unreasonable under the
circumstances. Doggett v. United States, 505 U.S. 647, 651-52, 112 S.Ct. 2686, 120 L.Ed.2d 520
(1992); Barker, 407 U.S. at 530. "If the accused makes this showing, the court must then consider,
as one factor among several, the extent to which the delay stretches beyond the bare minimum
needed to trigger judicial examination of the claim." Doggett, 505 U.S. at 652. In general, courts
deem delay approaching one year to be sufficiently unreasonable to trigger a Barker inquiry. Id. at
652 n.1.

 The record is unclear as to when Appellant was arrested. However, the indictment was
issued on July 17, 1997 and concerned acts allegedly occurring on or about May 9, 1997. He was
not tried until September 2002, an interval of over five years. This delay is sufficient to trigger the
Barker inquiry. Consequently, this factor weighs heavily in favor of finding a violation of the speedy
trial right. See Zamorano v. State, 84 S.W.3d 643, 649 (Tex.Crim.App. 2002)(finding that
"[b]ecause the length of the delay stretched well beyond the bare minimum needed to trigger judicial
examination of the [speedy trial] claim, this factor--in and of itself--weighs heavily against the
State").

Reason for Delay


 The State has the burden of justifying a lengthy delay. State v. Rangel, 980 S.W.2d 840, 843
(Tex.App.--San Antonio 1998, no pet.). Reasons for the delay are weighted differently. State v.
Munoz, 991 S.W.2d 818, 822 (Tex.Crim.App. 1999)(en banc). A deliberate attempt to delay a trial
is weighed heavily against the State, while more neutral reasons, such as negligence or overcrowded
dockets, are weighed less heavily. Id. If the record is silent regarding the reason for the delay, we
presume that no valid reason for the delay existed. Turner v. State, 545 S.W.2d 133, 137-38
(Tex.Crim.App. 1976); Rangel, 980 S.W.2d at 844. 

 Here, the State offered little to justify the five year delay between Appellant's arrest and his
trial. It claimed it was ready to proceed to trial and had tried to contact the inmate systems manager
for the Federal Bureau of Prisons but the telephone number was incorrect. Consequently, this factor
weighs in favor of finding a violation of the speedy trial right, although not heavily so. In the
absence of an assigned reason for the delay, a court may presume neither a deliberate attempt on the
part of the State to prejudice the defense nor a valid reason for the delay. Dragoo v. State, 96
S.W.3d 308, 314 (Tex.Crim.App. 2003).

Defendant's Assertion of His Right


 Although a defendant's failure to assert his speedy trial right does not amount to a waiver,
"failure to assert the right . . . make[s] it difficult for a defendant to prove that he was denied a
speedy trial." Barker, 407 U.S. at 532. This is so because a defendant's lack of a timely demand
for a speedy trial indicates strongly that he did not really want a speedy trial and that he was not
prejudiced by lack of one. Harris v. State, 827 S.W.2d 949, 957 (Tex.Crim.App.), cert. denied, 506
U.S. 942, 113 S.Ct. 381, 121 L.Ed.2d 292 (1992). Furthermore, the longer the delay, the more likely
a defendant who wished a speedy trial would be to take some action to obtain it.

 Appellant first asserted his speedy trial right on March 10, 1998. He filed an addendum on
July 13, 1998, and then a motion to dismiss indictments for failure to comply with the IADA. 
Appellant asserted his right approximately eight months after indictment. A lengthy delay in
asserting the right attenuates a speedy-trial claim. Haney v. State, 977 S.W.2d 638, 642 (Tex.App.--Fort Worth 1998, pet. ref'd). However, once Appellant asserted his right, he did so persistently and
this factor will weigh in Appellant's favor. See Russell v. State, 90 S.W.3d 865 (Tex.App.--San
Antonio 2002, pet. ref'd)(finding that an eight-month delay in filing a motion to dismiss for denial
of speedy trial was sufficient to assert right as long as the defendant had persistently continued to
assert his right once he had done so). 

Prejudice to the Defendant Resulting from the Delay


 The final factor we must analyze is what prejudice Appellant suffered as a result of the delay. 
In some cases, the delay may be so excessive so as to be presumptively prejudicial. Guajardo v.
State, 999 S.W.2d 566, 570 (Tex.App.--Houston [14th Dist.] 1999, pet. ref'd), citing Doggett v.
United States, 505 U.S. 647, 654-57, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). Yet even where the
delay is presumptively prejudicial, the defendant must nevertheless show that he has been prejudiced. 
Id. Once the defendant has made such a showing, the burden shifts to the State. Id. citing Ex parte
McKenzie, 491 S.W.2d 122, 123 (Tex.Crim.App. 1973). The prejudice to the defendant is assessed
in the light of the interests which the speedy trial right is designed to protect: preventing oppressive
pretrial incarceration; minimizing the anxiety and concern of the accused; and limiting the possibility
that the defense will be impaired. Munoz, 991 S.W.2d at 826. The defendant has the burden to make
some showing of prejudice. Id. During most of the time in question, Appellant was held in federal
custody. See Dragoo, 96 S.W.2d at 315 (finding that Appellant was in state prison serving a life
sentence for murder and that he was not prejudiced by the delay). After conducting the appropriate
balancing test, we perceive no violation of his Sixth Amendment right to a speedy trial. 

Interstate Agreement on Detainers Act


 The IADA is a Congressionally sanctioned compact between the United States and the states
and is subject to federal construction. Birdwell v. Skeen, 983 F.2d 1332, 1336 (5th Cir. 1993);
Espinoza v. State, 949 S.W.2d 10, 11 (Tex.App.--San Antonio 1997, pet. ref'd), citing Cuyler v.
Adams, 449 U.S. 433, 442, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981). This agreement allows
prosecutors in one jurisdiction to acquire the presence of defendants imprisoned in other jurisdictions
for trial prior to the expiration of their sentences. Tex.Code Crim.Proc.Ann. art. 51.14 (Vernon
1979). After the prosecutor places a detainer on a prisoner, that prisoner may request speedy
disposition of the charges under Article III of the IADA. The inmate bears the burden of
demonstrating compliance with the formal procedural requirements of Article III. U.S. v. Henson,
945 F.2d 430, 434 (1st Cir. 1991); Bryant v. State, 819 S.W.2d 927, 930-31 (Tex.App.--Houston
[14th Dist.] 1991, pet. ref'd). Once notified of the prisoner's request, the prosecutor has 180 days
to bring the prisoner to trial. If the prosecutor exceeds those 180 days, the charges are dismissed
with prejudice, and the detainer becomes invalid. Birdwell, 983 F.2d at 1336; IADA art. III, V,
Tex.Code Crim.Proc.Ann. art. 51.14.

 The decision to grant a defendant's motion to dismiss under the IADA is a question of law
which we review de novo; the factual findings underlying that decision are reviewed under a clearly
erroneous standard. State v. Sephus, 32 S.W.3d 369, 372 (Tex.App.--Waco 2000, pet. ref'd), citing
United States v. Hall, 974 F.2d 1201, 1204 (9th Cir. 1992). The provisions of Article III apply only
when a "detainer" has first been "lodged against the prisoner" with the custodial jurisdiction. 
Art. III(a), Tex.Code Crim.Proc.Ann. art. 51.14; see United States v. Mauro, 436 U.S. 340, 343,
98 S.Ct. 1834, 56 L.Ed.2d 329 (1978); Espinoza, 949 S.W.2d at 13. There is no definition of
"detainer" in the IADA. However, the United States Supreme Court has described a "detainer" as
"a request filed by a criminal justice agency with the institution in which a prisoner is incarcerated,
asking that the prisoner be held for the agency, or that the agency be advised when the prisoner's
release is imminent." Fex v. Michigan, 507 U.S. 43, 44, 113 S.Ct. 1085, 122 L.Ed.2d 406 (1993). 
Texas jurisprudence holds that a detainer is lodged when it is "filed" with the custodial institution. 
See Ex parte Bynum, 772 S.W.2d 113, 115 (Tex.Crim.App. 1989).

 The record does not include the State's detainer but it apparently was filed. One of the letters
sent by the inmate systems manager for the Federal Bureau of Prisons provides: "It appears that Mr.
Bland has not been brought to trial on the charges specified in your detainer and the 180 day time
period will lapse on July 06, 1998." [Emphasis added]. Consequently, Appellant must demonstrate
his compliance with the requirements under Article III of the IADA. See Henson, 945 F.2d at 434;
Bryant, 819 S.W.2d at 930-31.

 Under Article III, a prisoner may make a request for final disposition of the pending case in
the other jurisdiction. Tex.Code Crim.Proc.Ann. art. 51.14, art. III. If the defendant properly
makes the request for final disposition, he must be tried for the offense within 180 days or the charge
must be dismissed with prejudice. Id. art. III(a), (c). To request final disposition under Article III,
the defendant must cause "to be delivered to the prosecuting officer and the appropriate court of the
prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for
a final disposition to be made of the indictment." Id. art. III(a). The request must be accompanied
by a certificate of the appropriate official having custody of the prisoner stating: the term of
commitment under which the prisoner is being held; the time already served; the time remaining to
be served on the sentence; the amount of good time earned; the time of parole eligibility of the
prisoner; and any decision of the state parole agency relating to the prisoner. Id. The IADA provides
that the defendant can satisfy the requirement for sending the written notice and request for final
disposition under Article III by giving it to the official having custody of him, who must then
forward it to the appropriate prosecuting official and court via registered or certified mail. Id. art.
III(b). 

 Appellant did indeed send written notice to the proper prosecuting authority and court by
certified mail, return receipt requested. But there is no evidence that he complied with the certificate
requirements under Article III. Consequently, he has not satisfied his burden of showing a proper
application was made, and the IADA is inapplicable. See McNulty v. State, No. 05-02-00635-CR,
2003 WL 575212, at *2 (Tex.App.--Dallas Feb. 28, 2003, no pet.)(finding that the requirements of
IADA were not followed because Appellant failed to attach a certificate from the official having
custody). Because Appellant's Sixth Amendment right to a speedy trial was not violated and the
IADA is inapplicable, we overrule Point of Error No. Three.

SUFFICIENCY OF THE EVIDENCE


 In Point of Error No. Two, Appellant challenges the sufficiency of the evidence to support
his conviction. He does not specifically address legal sufficiency, but he has included cases setting
out the standards of review for both legal and factual insufficiency complaints. Therefore, we will
construe Appellant's point to attack both the legal and factual sufficiency of the evidence.

Factual Summary


 Appellant and his next door neighbors, Dana and Oscar Pena, had a history of problems. 
Appellant had complained about the Penas' children being too loud and coming into his yard. 
Appellant's house was located on the north side of the Penas' property where their driveway and a
basketball goal were located. When the Penas' children played basketball, the ball would bounce
into Appellant's yard. Oscar and Appellant had had words in the past. 

 On May 9, 1997, Dana arrived home, fixed dinner, and was resting while her daughter was
playing outside on the south side of their property. Her daughter came in three times complaining
that the Appellant was hollering at her and had placed candy on the fence separating the yards. 
Appellant was going in and out of his house, drinking, and playing loud music. Dana told Appellant
to leave her kids alone. Appellant just laughed and rocked in his chair. Dana called Oscar, who told
her to call the police and that he was on his way home. He arrived before the police did; he went to
the fence and had words with Appellant, who was sitting on his porch. Oscar saw that Appellant had
a white towel in his lap and that his hands were underneath the towel. Oscar came back home and
told his wife to call the police again because he was afraid that Appellant had a gun. 

 When the police arrived, Dana stayed inside and watched from the front window. Oscar
stood outside by the carport. The police arriving on the scene included Ronald Hoge and Ray
Henegar from the Kermit Police Department and Jaime Ramos from the Department of Public
Safety. When Hoge arrived, he observed Appellant sitting on his porch. When he approached
Appellant, Hoge saw a white rag in Appellant's lap covering his hands. Hoge ordered Appellant to
show his hands, and Appellant moved a little bit. Hoge then saw what appeared to be the butt of a
handgun with Appellant's hand wrapped around it. Hoge kept ordering Appellant to show his hands
and drop his weapon. He identified himself as a police officer and was wearing his uniform. 

 Henegar heard Appellant state that he would not drop his weapon and he appeared to be
moving the handgun toward Hoge. Although Appellant never pointed the gun at anyone, Hoge felt
his life was threatened, had fear of imminent bodily injury, and was about to fire on Appellant. 
Ramos grabbed Appellant and Henegar helped Ramos subdue him. In the process, the gun was
waiving around back and forth and was aimed at Henegar. Hoge was able to grab the weapon which
Appellant held in his right hand with his finger in the trigger guard. The safety was off and the gun
had a full magazine of bullets, with one round in the chamber. 

 The Vargas family also lived nearby. When Linda Vargas heard yelling outside, she looked
out the window and saw a police officer pointing his gun at Appellant, who was sitting on his porch. 
Appellant had his head down and never made any defensive or threatening movements. Linda never
saw Appellant with a gun but she saw an officer strike Appellant on the head with what appeared
to be a short stick. She told her husband, Carlos, that she saw Oscar yelling at Appellant and that
an officer had hit Appellant. Carlos testified that the children would antagonize Appellant by
purposely throwing the ball into his yard and walking along the bordering fence. Appellant
customarily sat on his porch each afternoon. Carlos never saw Appellant threaten anyone. He knew
Appellant was a felon but did not know he had any guns. Carlos knew that Appellant was afraid of
Oscar. 

 Appellant testified that Oscar had been threatening him for five months. Appellant had made
three complaints to the police about Oscar's conduct, and after the third complaint, Appellant had
begun carrying a pistol when he sat on his porch in the afternoon because Oscar would come over,
curse, and threaten him. Appellant was in fear of physical harm because of these threats. On the day
in question, Appellant was sitting on his porch when he heard giggling. When he looked up, he saw
the Penas' daughter and a friend peeking over the fence and giggling. Appellant then put a candy
bar on the fence to see the children's excitement. Later, Oscar walked around the fence and crossed
into his yard. They argued, and he heard someone shout, and saw a hand holding a pistol. Appellant
did not know the officers were present until he was lying face down on his porch and was
handcuffed. Appellant was hit on the head with a shotgun. He admitted he had a gun in his lap but
denied pointing the gun at anyone. He was not wearing his glasses or hearing aid. Appellant had
the gun in order to protect himself even though he knew it was against the law since he was a felon. 
He denied that the gun was cocked but he admitted he was going to shoot Oscar if he had come onto
his porch.

Standards of Review


 In reviewing the legal sufficiency of the evidence to support a criminal conviction, we must
review the evidence in a light most favorable to the verdict to determine whether any rational trier
of fact could have found the essential elements of the offense beyond a reasonable doubt. Jackson
v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); Geesa v. State, 820
S.W.2d 154, 159 (Tex.Crim.App. 1991), overruled on other grounds, Paulson v. State, 28 S.W.3d
570 (Tex.Crim.App. 2000); Levario v. State, 964 S.W.2d 290, 293-94 (Tex.App.--El Paso 1997, no
pet.). We do not resolve any conflict of fact or assign credibility to the witnesses, as it is within the
exclusive province of the finder of fact to do so. Adelman v. State, 828 S.W.2d 418, 421
(Tex.Crim.App. 1992); Lucero v. State, 915 S.W.2d 612, 614 (Tex.App.--El Paso 1996, pet. ref'd). 
Instead, we determine only if the explicit and implicit findings of the jury are rational when the
evidence admitted at trial is viewed in a light most favorable to the verdict. Adelman, 828 S.W.2d
at 421-22. In doing so, we resolve any inconsistencies in the evidence in favor of the verdict. 
Matson v. State, 819 S.W.2d 839, 843 (Tex.Crim.App. 1991); Menchaca v. State, 901 S.W.2d 640,
651 (Tex.App.--El Paso 1995, pet. ref'd).

 In reviewing factual sufficiency, we consider all of the evidence, but we do not view it in the
light most favorable to the verdict. See Clewis v. State, 922 S.W.2d 126, 129 (Tex.Crim.App. 1996);
Levario, 964 S.W.2d at 295. We will set aside the verdict only if it is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust. See Levario, 964 S.W.2d
at 295. In conducting a factual sufficiency review, we cannot substitute our conclusions for those
of the jury as it is not within our province to interfere with the jury's resolution of conflicts in the
evidence or to pass on the weight or credibility of the witness's testimony. See id. Where there is
conflicting evidence, the jury's verdict on such matters is generally regarded as conclusive. See id. 

Aggravated Assault on a Public Servant

 A person commits the offense of assault of a public servant if he intentionally or knowingly
threatens another with imminent bodily injury. See Tex.Pen.Code Ann. 22.01(a)(2)(Vernon Supp.
2004). Aggravated assault occurs if, in the course of committing an assault under Section 22.01, the
person uses or exhibits a deadly weapon. See Tex.Pen.Code Ann. § 22.02(a)(2). An offense under
Section 22.02 is a first-degree felony if the offense is committed against a person the actor knows
is a public servant while the public servant is lawfully discharging an official duty. See
Tex.Pen.Code Ann. § 22.02(b)(2). 

 A "public servant" is a "person elected, selected, appointed, employed, or otherwise
designated as . . . an officer, employee, or agent of government." Tex.Pen.Code Ann. §
1.07(a)(41)(A)(Vernon Supp. 2004). The actor is presumed to have known the person assaulted was
a public servant if the person was wearing a distinctive uniform or badge indicating the person's
employment as a public servant. Tex.Pen.Code Ann. § 22.02(c). "A person acts intentionally, or
with intent, with respect to the nature of his conduct or to a result of his conduct when it is his
conscious objective or desire to engage in the conduct or cause the result." Tex.Pen.Code Ann. §
6.03(a)(Vernon 2003). A defendant's intent may be inferred from his words, acts, and conduct at
the time of the offense. Dues v. State, 634 S.W.2d 304, 305 (Tex.Crim.App. 1982). "A person acts
knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances
surrounding his conduct when he is aware of the nature of his conduct or that the circumstances
exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he
is aware that his conduct is reasonably certain to cause the result." Tex.Pen.Code Ann. § 6.03(b). 
The indictment alleged as follows:

 TED CALVIN BLAND hereinafter styled Defendant, did on or about May 9, 1997,
and before the presentment of this indictment, in the County and State aforesaid, did
then and there intentionally and knowingly threaten Ron Hoge with imminent bodily
injury by exhibiting a deadly weapon, to-wit, a firearm, and the said Ron Hoge was
then and there a public servant acting under color of his employment, to wit, a police
officer with the Kermit Police Department, and the said defendant had been informed
and knew Ron Hoge was a public servant. 


Legal Sufficiency


 Viewing the evidence in a light most favorable to the verdict, we conclude that a rational jury
could reasonably infer from Appellant's conduct that he intentionally and knowingly threatened
Officer Hoge by moving his handgun in a position toward the officer while Hoge was ordering him
to drop his weapon and show his hands. Hoge identified himself as an officer and was wearing his
police uniform. Officer Henegar heard Appellant refuse to drop his weapon. Even if Appellant did
not intentionally threaten Hoge with the gun in his lap, the jury could infer that Appellant was aware
that his movement of the gun was reasonably certain to cause a threat of imminent bodily injury. 
Accordingly, the evidence is legally sufficient to sustain the conviction.

Factual Sufficiency


 Appellant contends that the State failed to establish that he made any aggressive moves,
pointed the gun at anyone, left his porch with the gun, or committed other illegal activity. Viewing
the evidence in a neutral light, we conclude that proof of Appellant's guilt is not so obviously weak
nor contrary proof so overwhelming that it renders the guilty verdict clearly wrong and manifestly
unjust. Hoge arrived on the scene wearing his uniform and was on official duty. He testified that
Appellant moved his gun in a position toward him. The gun was capable of causing serious bodily
injury or death and Hoge felt threatened with imminent bodily injury by Appellant's conduct. 
Although Appellant denied threatening Hoge in any way and testified that he did not know officers
were present until he was on the ground and handcuffed, the jury was free to disregard Appellant's
testimony as not credible. See Lee v. State, 29 S.W.3d 570, 574-75 (Tex.App.--Dallas 2000, no
pet.)(jury free to believe State's evidence over Appellant's). Accordingly, the evidence is factually
sufficient to sustain Appellant's verdict. Having found the evidence to be both legally and factually
sufficient, we overrule Point of Error No. Two.

IMPROPER JURY ARGUMENT


 In his first point of error, Appellant complains that the State's closing comments about parole
were improper:

 Mr. Fostel: For that reason, I feel that you should give him a period of at least 20-years, that means he's going to have to serve half that before he can
become eligible for parole-


 Mr. Frost: Your Honor, I'm going to object at this point. The Court's charge
clearly says you are not to consider the extend [sic] to which good
conduct time may be awarded to or forfeited by this particular
Defendant and you're not to consider the manner in which the parole
law may be applied to this particular defendant. He's asking them to
do that and I'm asking for mistrial now.


 The Court: Overruled. Motion for a Mistrial is denied.


 Mr. Frost: Note our exception.


 The Court: Ladies and gentlemen, the instruction [sic] of the Court are in the
Charge. Follow the instructions strictly as given you by the Court.


 Proper jury argument falls into four specific categories: (1) summation of the evidence, (2)
reasonable deduction from the evidence, (3) answer to argument by opposing counsel, and (4) plea
for law enforcement. Alejandro v. State, 493 S.W.2d 230, 231 (Tex.Crim.App. 1973); Van Zandt
v. State, 932 S.W.2d 88, 92 (Tex.App.--El Paso 1996, pet. ref'd). The law provides that it is
acceptable to quote or paraphrase the court's charge during argument. Perez v. State, 994 S.W.2d
233, 237 (Tex.App.--Waco 1999, no pet.). This includes explaining or paraphrasing the parole law
instruction in the charge. Id. However, it is improper for a prosecutor to apply the parole law to the
defendant during jury argument. Tex.Code Crim.Proc.Ann. art. 37.07, § 4(a)(Vernon Supp. 2004);
Perez, 994 S.W.2d at 237. There exists a thin, tenuous line between "paraphrasing" and "applying"
the parole law to a particular defendant. Perez, 994 S.W.2d at 237. Here, the prosecutor specifically
referred to Appellant when discussing parole law eligibility ("[H]e's going to have to serve half that
before he can become eligible for parole."). We agree that this constituted improper jury argument. 
See id.; see also Auguste v. State, No. 08-99-00303-CR, 2002 WL 475226, at *3 (Tex.App.--El Paso
Mar. 29, 2002, no pet.)(holding that prosecutor's argument applying parole law to defendant was
improper); Tijerina v. State, No. 04-01-00526-CR, 2003 WL 183686, at *2 (Tex.App.--San Antonio
Jan. 29, 2003, no pet.)(holding that prosecutor's argument applying parole law to defendant was
improper).

 Generally, improper jury argument may be cured by an instruction to disregard, unless in light
of the record as a whole it was extreme or manifestly improper, violative of a mandatory statute, or
injected new facts harmful to the accused. Cooks v. State, 844 S.W.2d 697, 727 (Tex.Crim.App.
1992), cert. denied, 509 U.S. 927, 113 S.Ct. 3048, 125 L.Ed.2d 732 (1993). Article 37.07, sec. 4,
subsections (c) and (d) address the mandatory nature of the statute. See Tex.Code Crim.Proc.Ann.
art. 37.07, § 4(c), (d). The final portion of the instruction required by subsection (c) states: 

 You may consider the existence of the parole law and good conduct time. However,
you are not to consider the extent to which good conduct time may be awarded to or
forfeited by this particular defendant. You are not to consider the manner in which
the parole law may be applied to this particular defendant. 


Tex.Code Crim.Proc.Ann. art. 37.07, § 4(c). Subsection (d) provides: "This section does not
permit the introduction of evidence on the operation of parole and good conduct time laws." 
Tex.Code Crim.Proc.Ann. art. 37.07, § 4(d). In light of this, the State's argument violated a
mandatory statute and the trial court's admonishment to strictly follow the instructions did not cure
the error. See Hawkins v. State, 99 S.W.3d 890, 901 (Tex.App.--Corpus Christi 2003, pet. ref'd).

 We must next conduct a harm analysis. As the error involves the trial court's application of
Texas statutory law, we utilize Tex.R.App.P. 44.2(b). See Espinosa v. State, 29 S.W.3d 257, 259
(Tex.App.--Houston [14th Dist.] 2000, pet. ref'd). Under this rule, error that does not affect a
substantial right must be disregarded. A substantial right is affected when the error had a substantial
and injurious effect or influence in determining the jury's verdict. King v. State, 953 S.W.2d 266,
271 (Tex.Crim.App. 1997), citing Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239,
1253, 90 L.Ed. 1557 (1946). If the error had no influence or only a slight influence on the verdict,
it is harmless. Johnson v. State, 967 S.W.2d 410, 417 (Tex.Crim.App. 1998). However, if we are
unsure whether the error affected the outcome, we should treat the error as harmful, i.e., as having
a substantial and injurious effect or influence in determining the jury's verdict. Webb v. State, 36
S.W.3d 164, 182 (Tex.App.--Houston [14th Dist.] 2000, pet. ref'd). Neither party has the burden
of proof under Rule 44.2(b). Id. Rather, the appellate court will examine the record for purposes
of determining harm. Id.

 We utilize a three-pronged test to determine harm: (1) the severity of the conduct as
evidenced by the prosecutor's argument (the magnitude of the prejudicial effect of the prosecutor's
remarks); (2) the measures adopted to cure the misconduct, that is, the effect of any cautionary
instruction given by the court; and (3) the certainty of conviction absent the misconduct. Martinez
v. State, 17 S.W.3d 677, 692-93 (Tex.Crim.App. 1998), citing Mosley v. State, 983 S.W.2d 249, 259
(Tex.Crim.App. 1998), cert. denied, 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999). 
Where, as here, the argument occurs at the punishment phase, we must consider the certainty of the
sentence. Hawkins, 99 S.W.3d at 891.

 Here, the prosecutor's misconduct was not severe. He made only one comment regarding
application of the parole law to the Appellant, and after the judge issued the curative statement
urging the jurors to follow the charge of the court, the prosecutor did not revisit the subject. See
Mestiza v. State, 923 S.W.2d 720, 724 (Tex.App.--Corpus Christi 1996, no pet.). Next, we consider
the measures adopted to cure the misconduct. The judge issued a curative statement for the jurors
to follow the instruction given by the court. Finally, we must consider the certainty of the sentence
absent the misconduct. The jury heard evidence concerning Appellant's numerous weapons
violations. He had possession of weapons from World War II that were subject to taxation, but he
failed to register or pay the tax on these weapons. Appellant was convicted of a federal felony
firearm crime and put on federal probation which he violated by leaving the country to serve in the
Rhodesian army. Appellant was no longer able to own guns because he was a convicted felon. 
However, upon his return to the United States he had a gun; he was arrested and served twenty-five
years in prison on another federal felony firearm possession. Appellant was released on probation,
but it was revoked when he discharged a weapon in an apartment complex. Appellant was later
imprisoned for having a weapon in his apartment. A sentence of thirty years appears appropriate and
is at the lower end of the range of punishment. Considering the record as a whole, we conclude that
the prosecutor's improper argument had no effect on Appellant's sentence. We overrule Point of
Error No. One and affirm the judgment of the court below.


May 20, 2004 

 ANN CRAWFORD McCLURE, Justice


Before Panel No. 2

Barajas, C.J., McClure, and Chew, JJ.


(Do Not Publish)