Filed 1/9/14  P. v. Carrillo CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TIMOTHY RALPH CARRILLO,<br><br>    Defendant and Appellant. | H037487<br>(Monterey County<br>Super. Ct. Nos. SS082394, SS071574,<br>SS082442) |

A jury convicted defendant Timothy Ralph Carrillo of three counts of grand theft (Pen. Code, § 487, subd. (a)),[1] four counts of theft from an elder adult (§ 368, subd. (d)), five counts of first degree burglary (§ 459), six counts of embezzlement of property from an employer (§§ 508, 487, subd. (a)), and six counts of contracting without a license (Bus. & Prof. Code, § 7028, subd. (a)).  Defendant waived his right to a jury trial on various prior conviction enhancement allegations, and the trial court found them to be true.  The court denied defendant's motion requesting dismissal of his prior strike conviction pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*) and sentenced him to an aggregate term of 35 years in prison, "consecutive to any other sentence that you're serving in any other state," including the 25-year term that he was then serving in Texas.

---

[1]    Subsequent statutory references are to the Penal Code unless otherwise noted.

On appeal, defendant contends that the trial court (1) prejudicially erred in denying his motion to dismiss for failure to comply with section 1389, California's codification of the Interstate Agreement on Detainers (IAD); (2) abused its discretion in denying his *Romero* motion; and (3) erred in refusing to award him one day of presentence custody credit. We affirm.

## I. Background

Posing as a licensed contractor, defendant entered into painting, roofing, and other repair and renovation contracts with elderly homeowners from 2006 through 2008 and took thousands of dollars in payment from them without performing any of the work he promised. He was on parole and/or on probation when he committed these offenses.

On May 2, 2007, the first of three cases alleging numerous theft-related felonies and contracting without a license was filed against defendant. In late 2007, there were warrants outstanding for his arrest in that case and for violating his probation in a 2005 misdemeanor driving under the influence (DUI) case by failing to enroll in a first offender DUI program. Defendant was apprehended on March 4, 2008, and released on bail that same day. On March 12, 2008, the trial court informed him of the charges in the felony case and revoked his probation in the DUI case "to retain jurisdiction."

Two additional felony cases alleging theft-related crimes and contracting without a license were filed in 2008.[2] On September 25, 2008, defendant failed to appear for arraignment in the three felony cases and on the probation violation in the DUI case. The trial court ordered his bail forfeited, revoked his probation, and issued a bench warrant for his arrest.

---

[2]     The second case was eventually dismissed as duplicative, and the remaining two cases (SS071574A and SS082394A) were consolidated for trial, with SS082394A as the lead case. The revocation proceeding in the DUI case (MS240748A) remained a separate matter trailing the felony cases.

2

In March 2009, the bail bondsman successfully moved to vacate the bond forfeiture on the ground that defendant was incarcerated in Texas. The district attorney told the court it had "a hold" on defendant, who would be transported to Monterey County once charges pending against him in Texas and in Alameda County were resolved.

On January 22, 2010, the Texas Department of Criminal Justice (TDCJ) wrote the Monterey County and the Santa Cruz County Sheriff's offices that "[n]otations have been made on our records indicating that [defendant] will be wanted by your office upon release from this institution." The TDCJ gave defendant copies of both letters with notices describing his rights under the IAD.

In a December 23, 2010 letter to the Monterey County Superior Court in Salinas, defendant asserted that he had "received detainers from your county as well as Santa Cruz County on 1-22-10 and filed the attached Request for final disposition on All untried indictments, informations or complaints from your state which I have heard nothing from your county." Defendant wrote that he was "again requesting final disposition of all indictments, informations and complaints from your county. . . . Please Acknowledge receipt of this letter and send me any further forms necessary to complete my request." The "attached Request" that defendant referred to is not included in the record on appeal.

In a March 7, 2011 letter to the clerk of the Monterey County Superior Court in Salinas, defendant wrote, "Enclosed is an official updated Time sheet stating term being served, Good Time earned and parole eligibility, please Add to file for your records. An additional copy will be sent to the District Attorney's office for Mr. Pesenhofer. The Enclosed is final paperwork require by I.A.D.A. [¶] Please send response stating you have received the enclosed Timesheet."

In a March 21, 2011 letter to the Monterey County Superior Court, defendant wrote, "In addition to letter sent on 3-7-11 I am requesting pro se that no continuances be

3

granted without my presence as well as no waivers of any rights without my actual presence in court . . . . [¶] The above is regarding my rights under the Interstate Agreement on Detainers Act, which the Court received on Feb 22, 2011."

On April 1, 2011, Monterey County Deputy District Attorney Glenn Pesenhofer signed and dated a "Form V -- Interstate Agreement on Detainers -- Request for Temporary Custody." Addressed to the TDCJ, the form sought temporary custody of defendant "pursuant to Article IV(a) of the [IAD]." Monterey County Superior Court Judge Timothy P. Roberts signed and dated the form on April 4, 2011, certifying that Pesenhofer was "an appropriate officer within the meaning of Article IV(a) and that the facts recited in this request for temporary custody are correct and that having duly recorded said request I hereby transmit it for action in accordance with its terms and the provisions of the IAD." Despite Pesenhofer's and Judge Roberts's handwritten attestations that they signed Form V in April *2011*, the clerk's file stamp indicated a filing date of April 4, 2010—exactly one year *before* Judge Roberts signed the form.

Defendant arrived in Monterey County from Texas on June 20, 2011, "or there abouts [*sic*]." At the beginning of his preliminary examination on July 1, 2011, his counsel moved to dismiss all charges on the ground that defendant had invoked his rights under section 1389 "over a year ago" and had not been brought to trial within the 180-day period prescribed by the statute. Counsel claimed that defendant had "forwarded a request, in February [2010], to the warden of the institution in which he was housed in Texas to ask that he be brought to Monterey County in order to face the charges . . . . And no response was ever received from Monterey County, nor was he transported until earlier this year, which, again, was more than 180 days after his initial request." The trial court deferred a ruling for failure to properly notice or brief the motion. The preliminary examination proceeded, and defendant was held to answer.

Defendant filed a properly noticed section 1389 motion to dismiss on July 11, 2011. In his motion papers, he asserted that upon learning that Santa Cruz and

4

Monterey counties had lodged detainers against him, he "promptly initiated an [IAD] request, and this written request along with the required paperwork was forwarded to Santa Cruz County on March 19, 2010." "*See Exhibit C, affidavit of TDCJ IAD Department employee*," defendant's motion papers stated, explaining in a footnote that the affidavit was "forthcoming" and would be submitted "separately in advance of the motion hearing date." There is no evidence in the record that any such affidavit was ever provided to the trial court, and it is not included in the record on appeal.

In his motion papers, defendant also contended "that he also promptly initiated an IAD request with regard to the Monterey County detainer in February or March 2010, however, TDCJ has no information with regard to that request; TDCJ only shows that notice of the detainer was sent to [defendant] on January 22, 2010."

The district attorney opposed defendant's section 1389 motion on the ground that there was "absolutely no showing" of compliance with the IAD's procedural requirements. The notices of detainer from the TDCJ that defendant attached to his motion were "incomplete documents," the district attorney pointed out. "The signature and date pages have been excluded, and one could argue the reason for their exclusion is because they are not favorable to the defendant's position." Defendant's assertion that Santa Cruz County had dismissed its case against defendant and cancelled its detainer, the district attorney argued, "doesn't provide any proof of proper notice to the Santa Cruz County District Attorney's Office," but "only show[s] that Santa Cruz [County] Superior court dismissed the case."

The parties submitted the matter on the papers, and the trial court denied the motion. "I do not feel that there is sufficient evidence to compel the Court to dismiss the matter," the court explained.

The parties proceeded to trial, and defendant was convicted and sentenced as previously described. He filed a timely notice of appeal.

5

## II.  Discussion

### A.  Section 1389 Motion to Dismiss All Charges

Defendant claims the trial court prejudicially erred and violated his federal and state constitutional rights to a speedy trial and to due process when it denied his section 1389 motion to dismiss the charges against him.  The Attorney General responds that defendant failed to show he complied with the IAD's provisions and thus has not established that the 180-day period prescribed by the IAD was ever triggered.  We agree with the Attorney General.

California and Texas are parties to the IAD, "an agreement among 48 states, the District of Columbia, Puerto Rico, the Virgin Islands, and the federal government that seeks to dispose of untried charges from states other than the one in which a prisoner is currently incarcerated."  (*People v. Oiknine* (1999) 79 Cal.App.4th 21, 23-24, 26; *People v. Castoe* (1978) 86 Cal.App.3d 484, 487 (*Castoe*).)  When a state lodges a detainer based on an uncharged indictment, information or complaint against a prisoner in another jurisdiction, the prisoner must be "promptly" notified of the detainer and informed "of his right to make a request for final disposition" of the pending charges.  (§ 1389, art. III, subd. (c).)  Either the prisoner or the prosecutor in the state where charges are pending may then initiate procedures leading to transfer and disposition of the charges.  (§ 1389, arts. III, IV.)  If the prisoner initiates the request, he must be brought to trial within 180 days after the appropriate court and prosecutor receive formal notification.  (§ 1389, art. III, subd. (a); *Fex v. Michigan* (1993) 507 U.S. 43, 52 (*Fex*).)  If the prosecutor initiates an IAD transfer proceeding, the prisoner must be brought to trial within 120 days of the prisoner's arrival in the receiving state.  (§ 1389, art. IV, subd. (c).)  "The failure of the state receiving the request to act in compliance with the IAD and the 180-day [or the 120-day] limit results in dismissal of the pending criminal charges with prejudice."  (*People v. Brooks* (1987) 189 Cal.App.3d 866, 872 (*Brooks*).)

6

"In order to take advantage of the sanction of dismissal, the prisoner must comply with the procedural requirements of the IAD." (*People v. Lavin* (2001) 88 Cal.App.4th 609, 616 (*Lavin*).) The procedures for prisoner-initiated transfers are found in article III. " ' "Article III, subdivision (a) provides that the 180-day period is to run from the date the prisoner 'shall have caused to be delivered' a written notice and request for final disposition to the district attorney and the court. Article III, subdivision (b) clearly states that the prisoner shall give or send the notice and request *to the warden, commissioner of corrections or other official having custody of the prisoner*." [Citation.] [¶] The warden then prepares a certificate "stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any decisions of the state parole agency relating to the prisoner." (§ 1389, art. III, subd. (a).)' [Citation.]" (*Lavin*, at p. 616.)

Defendant argues that the trial court erred in denying his section 1389 motion, since he "made a valid demand for trial in California" in early 2010. We find nothing in the record to support that claim. The letters that defendant sent to the district attorney and/or to the superior court were dated well after the request he claimed to have made "in February or March 2010" and were in any event ineffective to invoke his rights under the IAD because, among other deficiencies, they were not sent through the warden of the Texas prison. (*Castoe*, *supra*, 86 Cal.App.3d at p. 490 ["Article III . . . does not permit a prisoner's self-help effort to start the running of the 180-day period."]; accord, *Lavin*, *supra*, 88 Cal.App.4th at pp. 616-617 [demand sent directly to the court was "clearly insufficient to invoke the time period of section 1389"].)

In his motion below, defendant purported to rely on a "forthcoming" affidavit of a "TDCJ IAD Department employee," but no such affidavit was ever produced, and defendant was forced to concede that the TDCJ had "no information" about the IAD request that he claims to have made "in February or March 2010." (Italics omitted.)

7

Thus, no evidence supports his claim that he made a valid IAD demand "in February of March 2010."

Defendant argues, however, that the Santa Cruz County Superior Court's May 26, 2010 dismissal of its case against him and the TDCJ's subsequent cancellation of Santa Cruz County's detainer "establishes that [defendant] properly presented his demands for trial to the warden of the Texas prison, who would have been required to forward them, along with the certifications, to both the Santa Cruz County authorities and the Monterey County authorities." We are not persuaded. The minutes of the May 26, 2010 hearing state that the Santa Cruz charges against defendant were "dismissed in the interest of justice." They establish nothing more than that.

Defendant argues that the IAD request he claims to have made "in February or March 2010" must have been delivered to Monterey County because "the district attorney responded by requesting [defendant's] temporary custody in a form filed on April 4, 2010." The argument lacks merit.

It is pure speculation that the form defendant relies on was sent in response to any sort of communication from him. It is doubtful, moreover, that the form was "filed on April 4, 2010." Entitled "Form V -- Interstate Agreement on Detainers -- Request for Temporary Custody," the form was signed and dated by Pesenhofer and by Judge Roberts on April 1 and April 4, 2011. The file stamp indicates a filing date a year earlier, on April 4, 2010.

"The significance here," defendant urges, "is the filing date of April 4, 2010." This is his only reference to the obvious disparity between the "2010" file stamp and the "2011" dates that Pesenhofer and Judge Roberts both handwrote next to their signatures. Defendant does not attempt to explain how Pesenhofer and Judge Roberts, who signed and dated the request three days apart, could *both* have gotten the year wrong. He simply assumes that the 2010 file stamp date is the correct one. We find the assumption insupportable.

8

We think it is far more likely that the filing date stamped on the document was the result of clerical error. Pesenhofer signed the request for temporary custody on April 1, 2011. Judge Roberts signed it three days later, on April 4, 2011. The date Judge Roberts handwrote on the document and the date the court clerk stamped on it are exactly one year apart. Clerical error is the most reasonable explanation for the discrepancy. (See, e.g., *People v. Barnes* (1990) 219 Cal.App.3d 1468, 1472, fn. 3 ["The motion bears the clerk's filing stamp of January 25, 1988, but the motion is dated January 25, 1989, and it is clear from the sequence of events in the record that the correct date for that motion is 1989; this is only a clerical error."]; *Price v. Grayson* (1969) 276 Cal.App.2d 50, 54 ["This second delay without any activity was interrupted on April 1, 1968, by defendant who, miscalculating the time through a clerk's error in affixing the filing date to her copy of the complaint (the stamp shows 1963 instead of 1964), filed a motion to dismiss."].)

Our conclusion is bolstered by the fact that an April 4, 2011 filing date fits the sequence of events in the record. Two plausible scenarios support an April 4, 2011 filing date; none support an April 4, 2010 filing date.

The form states on its face that it was made "pursuant to Article IV(a) of the [IAD]." It also states that the district attorney "propose[d] to bring this person to trial . . . within the time specified in Article IV(c) of the IAD." This language suggests to us that defendant's transfer was initiated not by defendant under article III of the IAD but instead by the district attorney under article IV. (§ 1389, art. IV.) Pesenhofer signed the request on April 1, 2011; Judge Roberts approved it, and it was presumably then sent to Texas. (§ 1389, art. IV, subd. (a).) Defendant arrived in California approximately 11 weeks later. The 11-week interim would have given the Texas prison authorities time to make arrangements for his transfer and, more importantly, to comply with the IAD's requirement of a 30-day waiting period "after receipt by the appropriate authorities [of a prosecutor-initiated request] before the request be honored, within which period the

9

governor of the sending state may disapprove the request for temporary custody . . . ." (§ 1389, art. IV, subd. (a).) Defendant's trial commenced on August 15, 2011, eight weeks after his arrival and, therefore, well within the 120-days-after-arrival limitations period that the IAD prescribes for prosecutor-initiated transfers. (§ 1389, art. IV, subd. (c).)

Defendant's own assertions suggest an alternative scenario that also fits the sequence of events in the record. Defendant claimed to have made a "second" IAD request in early 2011. In his motion papers, he asserted that he "[f]inally . . . decided to cause delivery himself to Monterey County of his IAD request . . . . On February 22, 2011, Monterey County received [this] personally served notice of request for final disposition pursuant to [the] IAD and caused [defendant] to be delivered to the State of California . . . ." Defendant's claimed *second* request is not in the record, but there are references to it. At a trial-setting conference on July 1, 2011, for example, his trial counsel referred to "the 1389 that has been accepted by the District Attorney" and stated that "[o]n the 1389 demand that was received by the District Attorney, the last day [to try the case] would . . . be [August] 20th . . . ." .

The IAD requires that a defendant be brought to trial within 180 days after the court and the prosecuting authority actually receive a prisoner-initiated IAD transfer request. (§ 1389, art. III, subd. (a); *Fex, supra*, 507 U.S. at p. 52.) August 20, 2011, which the defense asserted was the "last day" to try the case under section 1389, is 180 days after February 22, 2011, the date on which defendant claimed the district attorney "accepted" his IAD request.

The record thus supports a conclusion that the form request for temporary custody was triggered either by the district attorney or by an IAD request that defendant initiated *in 2011* rather than "in February or March 2010." Defendant's reliance on the form to support his section 1389 motion was therefore misplaced. There was no evidence to support his claim that he invoked the protection of the IAD in 2010. The trial court

properly denied defendant's motion. (E.g., *People v. Garner* (1990) 224 Cal.App.3d 1363, 1370-1371 [section 1389 motion properly denied where, among other things, "[t]he record here shows neither the October nor November request was presented to the warden"]; *Brooks*, *supra*, 189 Cal.App.3d at p. 869 [section 1389 motion properly denied where, among other things, there was "no evidence the Oregon State Penitentiary authorities completed the certificate required to accompany Brooks's IAD request."].)

It follows that there was no violation of defendant's constitutional rights. (*People v. Osband* (1996) 13 Cal.4th 622, 675 ["Because there was no state law error, neither was there any predicate for a constitutional violation."].)

## B. *Romero* Motion

Defendant contends that the trial court abused its discretion and violated his due process rights by denying his *Romero* motion. We disagree.

"[A] court's failure to dismiss or strike a prior conviction allegation is subject to review under the deferential abuse of discretion standard." (*People v. Carmony* (2004) 33 Cal.4th 367, 374 (*Carmony*).) "In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, '"[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve the legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review."' [Citations.] Second, a '"decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.'"' [Citations.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Carmony*, at pp. 376-377.)

11

"[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation or finding under the Three Strikes law . . . 'in furtherance of justice' pursuant to Penal Code section 1385(a), or in reviewing such a ruling, the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not presently been convicted of one or more serious felonies and/or violent felonies." (*People* v. *Williams* (1998) 17 Cal.4th 148, 161 (*Williams*).)

Applying that analysis here, the trial court found that defendant "clearly fit the purpose of the three strikes law." Indeed, the court added, "there probably aren't too many people that fit it as well as he does."

The record supports the trial court's conclusion. The probation report described defendant as "a multi-state offender" with an extensive criminal history in California, Colorado, and Texas. He had accumulated 10 felony and numerous misdemeanor convictions between 1978 and 2007, including convictions for first degree burglary, obtaining money by false pretenses, grand theft, forgery, battery, and felony DUI. Two prison terms in California, a third in Colorado, and "countless years, months, and days, in jails" did not persuade him to change his criminal ways, and he was serving a 25-year sentence in Texas when he was tried in this case. Although he has repeatedly been granted probation, his performance could "only be described as contemptible." He "absconded from every grant of probation and parole he was placed on, and failed to appear in Court on multiple occasions." He was on parole and/or on probation when he committed many of the offenses in this case. His 30-year criminal record, in short, made him "the kind of revolving-door career criminal for whom the Three Strikes law was devised." (*People v. Gaston* (1999) 74 Cal.App.4th 310, 320 (*Gaston*).) The denial of his *Romero* motion was not an abuse of discretion.

12

Defendant argues, however, that his prior strike was too remote, having occurred "almost 32 years ago," when he was "merely 19 years old" and "dependent on alcohol consumption and gambling." Courts have routinely rejected similar arguments where the defendant did not live a crime-free life between his or her strike prior and current crimes. (E.g., *Gaston*, *supra*, 74 Cal.App.4th at p. 321 [abuse of discretion to strike 17-year-old prior where the defendant's "continuous crime spree . . . substantially spanned his entire adult life"]; *People v. Barrera* (1999) 70 Cal.App.4th 541, 554-555 (*Barrera*) [refusal to dismiss 14-year-old strike justified where the defendant's criminal activity "continued unabated" upon his release from prison, "despite . . . the drug rehabilitation efforts" he claimed to have made]; *People v. Humphrey* (1997) 58 Cal.App.4th 809, 813 (*Humphrey*) [reversing the dismissal of a 20-year-old prior].) "In determining whether a prior conviction is remote, the trial court should not simply consult the Gregorian calendar with blinders on." (*Humphrey*, at p. 813.) A remote prior may properly be stricken where the record establishes "a crime-free cleansing period of rehabilitation after a defendant has had the opportunity to reflect upon the error of his or her ways." (*Ibid*.) That was not the case here. Here, as in the above cases, defendant's 30-year criminal record renders the remoteness of his prior strike "not significant." (*Gaston*, at p. 321.)

Defendant also urges that his prior strike for first degree burglary is the only serious or violent offense on his record and did not involve "any actual violence." The argument lacks merit. "[T]he Three Strikes law does not require *multiple* violent felony offenses . . . . The Three Strikes law only requires that a defendant be convicted of a current felony and have 'one or more prior [serious or violent] felony convictions . . . .'" (*People v. Strong* (2001) 87 Cal.App.4th 328, 340.) Where a defendant comes within the letter of the three strikes law, the *Strong* court reasoned, he cannot logically argue that his "commission of *additional* nonqualifying felonies over a lengthy period" should operate as mitigation so as to take him outside the spirit of the law. (*Ibid*.)

13

The logic applied in *Strong* applies here. Defendant's crimes since his 1978 strike offense, while not classified as violent or serious felonies, were "far from trivial." (*Gaston*, *supra*, 74 Cal.App.4th at p. 322.) He had "developed a sophisticated, well orchestrated criminal enterprise," and he used his acquired salesman's skills to cheat elderly people. His "predatory actions" instilled fear and a sense of insecurity in his victims and caused them financial and emotional hardship. Instead of taking responsibility for his decisions, defendant "blamed alcohol and gambling" for his choices and "used his traumatic childhood experiences as an excuse . . . ." His callous actions were "inexcusable and richly deserving of [a] lengthy prison sentence . . . ."

The trial court emphasized the harm defendant caused his victims. "[Y]ou're a predator," the court told him. Most people "want to protect and want to look out for elderly people. We want to raise our kids to take care of us. And here you are preying on [the] elderly and raising your kid, teaching her how to commit crimes against the elderly. I mean, you've wrecked both ends of the spectrum here, and you don't care. You just do it. It works." On this record, the fact that defendant's crimes were not classified as violent or serious felonies does not place him "outside the scheme's spirit, in whole or in part." (*Williams*, *supra*, 17 Cal.4th at p. 161.)

Defendant argues that the trial court "failed to take into consideration" that he would have to serve a maximum 21-year sentence even with the strike prior dismissed. Not so. The record shows that the court in fact considered that argument. Defendant argued in his motion papers that "[a] 35-year sentence for nonviolent thefts . . . may be justified" for fraud "on the scale of Madoff Investment Securities" but "verge[d] on overkill" in this case. "[A] 21-year sentence ([the defense's] calculation of the maximum term if the strike is stricken) could hardly be characterized as 'getting off easy,'" defendant urged. His trial counsel made the same argument at the hearing. We can conclude from the trial court's ruling that the court considered *and rejected* the argument. And properly so. As the probation report noted, three prison terms and "countless" time

14

in jails had not persuaded defendant to change his criminal ways, and his "blatant refusal to comply with probation and parole show[ed] his unwillingness to do whatever it takes to change."

Defendant's reliance on *People v. Garcia* (1999) 20 Cal.4th 490 (*Garcia*) is misplaced. In *Garcia*, the court declared that "a defendant's sentence is also a relevant consideration when deciding whether to strike a prior conviction allegation; in fact, it is the overarching consideration because the underlying purpose of striking prior conviction allegations is the avoidance of unjust sentences." (*Id.* at p. 500.) The court held that the trial court did not abuse its discretion in striking one of Garcia's two burglary priors. (*Id.* at p. 503.) The sentence the court imposed, 31 years and 4 months to life in prison, was "not lenient" and, therefore, not "inconsistent with the purpose of the Three Strikes law." (*Ibid.*)

*Garcia* is easily distinguished. Garcia's prior convictions "all arose from a single period of aberrant behavior for which he served a single prison term." (*Garcia*, *supra*, 20 Cal.4th at p. 503.) He cooperated with police, his crimes were linked to his drug addiction, and his criminal history did not include any actual violence. (*Ibid.*) These circumstances cumulatively indicated that he could be " 'deemed outside the [Three Strikes] scheme's spirit,' at least 'in part,' and that the trial court acted within the limits of its section 1385 discretion. [Citation.]" (*Ibid.*)

The facts of this case are different. Defendant's crimes, unlike Garcia's, were not attributable to "a single period of aberrant behavior for which he served a single prison term." Instead, they spanned a 30-year period that included four prison terms and "countless" time in jails. (*Garcia*, *supra*, 20 Cal.4th at p. 503.) Here, unlike in *Garcia*, there was no evidence that defendant cooperated with police, and only his own self-serving statement to the probation officer established that he had "a gambling problem and an alcohol problem." *Garcia* is inapposite.

15

We agree with the trial court's conclusion that defendant "clearly fit the purpose of the three strikes law."  The denial of defendant's *Romero* motion was not an abuse of discretion.  (*Carmony*, *supra*, 33 Cal.4th at pp. 376-377.)  It follows that there was no violation of defendant's due process rights.  (See *In re Large* (2007) 41 Cal.4th 538, 550.)

### C.  Presentence Custody Credit

Asserting that he was "arrested in this consolidated matter on March 4, 2008," defendant claims the trial court erred in failing to award him presentence custody credit for that day.  The Attorney General argues that "[t]he argument has been forfeited because it was not raised in the trial court, where the relevant facts could have been developed and evaluated."  She urges us to summarily dismiss defendant's claim.

Defendant did not forfeit the argument.  "A sentence that fails to award legally mandated custody credit is unauthorized and may be corrected whenever discovered." (*People v. Taylor* (2004) 119 Cal.App.4th 628, 647; see generally *People v. Serrato* (1973) 9 Cal.3d 753, 763 ["well settled" that unauthorized sentence is "subject to judicial correction whenever the error [comes] to the attention of the trial court or a reviewing court"], disapproved on another ground in *People v. Fosselman* (1983) 33 Cal.3d 572, 583, fn. 1.)  Nor does section 1237.1 require us to summarily dismiss defendant's claim. The rule requiring a defendant to move to correct an award of presentence custody credit in the trial court before raising the issue on appeal does not apply when the appeal raises multiple issues.  (*People v. Acosta* (1996) 48 Cal.App.4th 411, 427-428 & fn. 8.)  We proceed, therefore, to the merits of defendant's claim.

Section 2900. 5 provides that "[i]n all felony and misdemeanor convictions, . . . when the defendant has been in custody, . . . all days of custody of the defendant . . . shall be credited upon his or her term of imprisonment."  (§ 2900. 5, subd. (a).)  But "credit shall be given only where the custody to be credited is attributable to proceedings related

16

to the same conduct for which the defendant has been convicted. Credit shall be given only once for a single period of custody attributable to multiple offenses for which a consecutive sentence is imposed." (§ 2900. 5, subd. (b).)

As the California Supreme Court has noted, " 'section 2900. 5, subdivision (b), is "difficult to interpret and apply." ' " (*In re Marquez* (2003) 30 Cal.4th 14, 19 (*Marquez*).) Two high court cases, *People v. Bruner* (1995) 9 Cal.4th 1178 (*Bruner*) and *Marquez*, inform our analysis here.

In *Bruner,* the court emphasized that "[s]ection 2900. 5 is not intended to bestow the windfall of duplicative credits against all terms or sentences that are separately imposed in multiple proceedings." (*Bruner*, *supra*, 9 Cal.4th at p. 1191.) Bruner was sentenced to 12 months after his parole was revoked, and he "received full credit against this term for the time spent in jail custody" between his arrest and the parole revocation. (*Id*. at p. 1181.) While serving his 12-month sentence, Bruner pleaded guilty to cocaine-possession charges in a new information and received a concurrent 16-month sentence for that conviction. (*Ibid*.) The court held that he was not entitled to duplicate credit against the new sentence. (*Id.* at p. 1183.) Although the presentence custody Bruner argued should be credited was at least arguably " 'attributable to proceedings related to the *same conduct* for which [he] was convicted,' " he had *already* received credit for that time. A rule of " 'strict causation' " applies in such " 'multiple restraint' " cases. (*Bruner,* at p. 1180.) "[W]here a period of presentence custody stems from multiple, unrelated incidents of misconduct, such custody may not be credited against a subsequent formal term of incarceration if the prisoner has not shown that the conduct which underlies the term to be credited was also a 'but for' cause of the earlier restraint." (*Bruner*, at pp. 1193-1194.)

In *Marquez,* the court recognized an exception to the strict causation rule in certain multiple restraint cases that do not involve the possibility of duplicate credit. Marquez was arrested in Monterey County on suspicion of first degree burglary and released on

bail a few days later. (*Marquez*, *supra*, 30 Cal.4th at p. 17.) Two weeks later, he was arrested in Santa Cruz County on suspicion of another burglary. (*Ibid*.) He remained in custody in Santa Cruz County, and Monterey County placed a "hold" on him. (*Ibid*.) The Santa Cruz County case was tried first; Marquez was convicted and sentenced to prison, with credit for his time in custody between the date of his arrest in Santa Cruz County and sentencing. (*Id*. at p. 18.) He was then transferred to Monterey County, and convicted and sentenced in that case.

Marquez appealed both convictions. His sentence in the Santa Cruz County case was ultimately vacated and the charges dismissed. (*Marquez*, *supra*, 30 Cal.4th at p. 18.) He then sought to have the time he spent in custody from the day he was sentenced in the Santa Cruz County case to the day he was sentenced in the Monterey County case credited against his sentence in the Monterey County case. (*Ibid*.)

The high court held that the plain meaning of section 2900. 5, subdivision (b) supported Marquez's claim, because the time for which he sought credit could properly be deemed "'attributable to proceedings related to the same conduct for which [he] ha[d] been convicted'" in the Monterey County case. (*Marquez*, *supra*, 30 Cal.4th at p. 20.) The case was not a duplicate credit case, the court emphasized. Unlike in *Bruner*, "the choice is not between awarding credit once or awarding it twice. The choice is instead between granting [Marquez] credit *once* for his time in custody between December 11, 1991, and April 2, 1992, or granting him *no credit at all* for this period of local custody." (*Id*. at p. 23.) To deny him that credit "would render this period 'dead time.'" (*Id*. at p. 20.)

Applying these cases here, we conclude on the record before us that defendant has not established his entitlement to custody credit for March 4, 2008, since he has not "shown that the conduct which underlies the term to be credited was also a 'but for' cause of the earlier restraint." (*Bruner*, *supra*, 9 Cal.4th at pp. 1193-1194.) His arrest on March 4, 2008, was attributable to two different cases—the first felony case and the 2005

18

DUI case. Warrants had been issued for his arrest in both cases in late 2007. He posted $30,000 bail in the felony case and $5,000 bail in the DUI case. He appeared on March 12, 2008, in both cases. The probation report reflects that the probation violation in the DUI case was based not only on his arrest in the felony case but also "based on failure to enroll in 1st offender DUI program." Thus, his incarceration on March 4, 2008, was attributable to two independent grounds: the offenses charged in the felony complaint and his failure to enroll in a first offender DUI program.

The probation department calculated defendant's custody credits in the DUI case and in the consolidated felony cases. The calculation for the DUI case shows one day's credit for March 4, 2008.[3] Defendant was not entitled to duplicative credit in the felony cases. (*Bruner*, *supra*, 9 Cal.4th at pp. 1193-1194.)

Defendant does not mention the DUI probation revocation case, nor does he acknowledge that the probation report credits March 4, 2008, to that case. He states only that he posted a $30,000 bail bond on March 4, 2008, for his "release . . . from custody in [the felony case]." He does not mention the $5,000 bail that he posted in the DUI probation revocation case.

---

[3] The calculation for the DUI case shows 18 additional days between November 14 and December 1, 2005, for a total of 19 days of "actual time." It shows 8 days of "good/work time" for this period. It also shows 91 days of "actual time" between June 18 (the date of defendant's "rearrest") and September 16, 2011. It explains that he is not entitled to credit for those days because during that time "he was serving a prison sentence and was on detainer to Monterey County from the Texas Department of Justice, a supervision status independent of the criminal conduct arising from the instant case. A hold was placed upon the defendant at the Monterey County Jail."

The probation department also calculated defendant's custody credits in the consolidated felony cases. That calculation shows 91 "actual days" between June 18 and September 16, 2011, but notes that defendant is not eligible for credit for those days because he was serving a prison sentence in Texas and "on detainer to Monterey County from the Texas Department of Justice, a supervision status independent of the criminal conduct arising from the instant case. Following his arrest for the instant case, a hold was placed upon the defendant at the Monterey County Jail."

On the record before us, we cannot conclude that defendant's incarceration on March 4, 2008, was entirely "attributable to proceedings related to the same conduct for which the defendant has been convicted." (§ 2900.5, subd. (b); *Bruner*, *supra*, 9 Cal.4th at p. 1191.) The evidence to the contrary was uncontradicted. Because defendant's criminal sentence "may not be credited with jail or prison time attributable to a parole or probation revocation that was based *only in part* upon the same criminal episode," and because he has not shown "that the conduct which led to his conviction was the sole reason for his loss of liberty" on March 4, 2008, he has failed to establish his entitlement to custody credit, in the consolidated felony cases, for that day. (*Bruner*, at pp. 1191, 1193-1194.) The trial court properly awarded no custody credit in the consolidated case for March 4, 2008. (*Ibid*.)

On the sparse record before us, we cannot determine whether defendant's situation comes within the exception established by *Marquez.* He was sentenced on October 12, 2011. His probation in the DUI case was "revoked and terminated" that same day. The record on appeal contains virtually no evidence about what happened in the DUI case between defendant's March 4, 2008 arrest and his October 12, 2011 sentencing. It may be that this is not a duplicative credits case and that, like Marquez, defendant received no credit at all for time served on March 4, 2008. If that is the case, then the "'dead time'" might properly be credited to the consolidated felony cases. (See *Marquez*, *supra*, 30 Cal.4th at p. 20.)

"The most expeditious and . . . appropriate method of correction of errors of this kind is to move for correction in the trial court." (*People v. Fares* (1993) 16 Cal.App.4th 954, 958 (*Fares*).) "There is no time limitation upon the right to make the motion to correct the sentence. 'The . . . effect of the court's failure to comply with [§ 2900.5, subd. (d)], [is] to render its initial finding and resulting sentence a nullity. It follows that once appropriately apprised of its inadvertence, the court therein [becomes] licensed to impose a proper finding and sentence. [Citations.]' [Citation.] The court's power to correct its

20

judgment includes corrections required not only by errors of fact (as in the mathematical calculation) but also by errors of law." (*Fares*, at p. 958; *People v. Shabazz* (2003) 107 Cal.App.4th 1255, 1259 ["In the event defendant's parole was never revoked or he was denied any credits by the Board of Prison Terms, he can seek a modification of the presentence credit order in superior court."].)  Therefore, if defendant can make the proper showing, he is "free to file a motion in the trial court requesting relief." (*People v. Clavel* (2002) 103 Cal.App.4th 516, 519.)

### III.  Disposition

The judgment is affirmed.

_____
Mihara, J.

WE CONCUR:


_____
Premo, Acting P. J.


_____
Grover, J.